## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | |
|---|---|
| Leslie Deaver, on behalf of herself and a class of all others similarly situated, Robert B. Deaver, Nicholas A. Marino, Jennifer Marino, Amber Brown, Barry Bumford, Catherine B. Burns, Katie L. Higgs, Troy L. Higgs, Robert Keene, Jennifer Poston, Melissa Morris, Travis Shippell, Myrna S. Siebel, and Daniel Howell,<br><br>           Plaintiffs,<br><br>   v.<br><br>Century Aluminum Company and Century Aluminum of South Carolina, Inc.,<br><br>           Defendants. | CIVIL ACTION NO.: 2:23-cv-05766-RMG<br><br><br><br>**COMPLAINT** |

Plaintiffs Leslie Deaver, on behalf of herself and a class of all others similarly situated, Robert B. Deaver, Nicholas A. Marino, Jennifer Marino, Amber Brown, Barry Bumford, Catherine B. Burns, Katie L. Higgs, Troy L. Higgs, Robert Keene, Jennifer Poston, Melissa Morris, Travis Shippell, Myrna S. Siebel, and Daniel Howell, by and through their undersigned counsel, ("Plaintiffs"), complain of Defendants Century Aluminum Company and Century Aluminum of South Carolina, Inc. ("Defendants") as follows:

## INTRODUCTION

1. This class action seeks damages from Defendants for the egregious, repeated harmful emissions of aluminum oxide, also known as alumina, and other particulates from Defendants' Mount Holly aluminum smelter (the "Smelter") into the air and from there into, onto,

and causing damages to the bodies of and the properties of residents of Goose Creek, South Carolina and the surrounding area.

2.     The Smelter's operations create particulates—microscopic solid particles suspended in the air—that are removed from the Smelter's emissions through an emissions control system.

3.     In or around March and April of 2023, the Smelter began emitting significantly greater quantities of particulates, with the substantial quantities of particulates accumulating and remaining suspended in the air in the areas around the Smelter and eventually settling out of the air throughout the areas surrounding the Smelter.

4.     On September 3, 2023, the Smelter's emissions control system malfunctioned, and substantial quantities of aluminum oxide particulates and other particulates were emitted from the Smelter and into the air in Goose Creek.

5.     The aluminum oxide particulates and other particulates emitted from the Smelter were suspended in the air in the area in Goose Creek around the Smelter where residents inhaled the particulates.

6.     Depending on the size of the particulates, the particulates were trapped by mucous membranes in residents' noses, throats, eyes, and ears, were inhaled into residents' lungs, or passed through resident's lungs into their blood.

7.     Particulates trapped by residents' mucous membranes caused residents to suffer irritation, itching, swelling, congestion, sinus issues, coughs, bloody noses, and headaches.

8.     Particulates entering residents' lungs caused residents to suffer shortness of breath, asthma, inflammation, headaches, and permanent impairment.

9.      Particulates settling out of the air were deposited on residents' real and personal property causing scratching of and damage to finished and painted surfaces including the paint on residents' homes, cars, and barbecue grills.

10.     Particulates settling out of the air were deposited on residents' lawns and caused health issues for pets.

11.     Rather than shut down the Smelter and stop the harmful particulate emissions, Defendants chose to continue operating the plant and emitting particulates.

12.     Defendants knew or learned from examination of the emissions control system that the filter bags were failing and that accelerated scale growth in the Smelter was causing increased pressure in the emissions control system and bag failure.

13.     On September 16, 2023, the Smelter's emissions control system again malfunctioned on two occasions, and again, Defendants chose to continue operating the plant and emitting particulates.

14.     During and following the September 16, 2023 particulate releases from the Smelter, Residents of the areas in Goose Creek around the Smelter were again subjected to injuries to their persons and real and personal property caused by exposure to the emitted particulates.

15.     On September 30, 2023, the Smelter's emissions control system again malfunctioned, and again, Defendants chose to continue operating the plant and emitting particulates.

16.     During and following the September 30, 2023 particulate releases from the Smelter, residents of the areas in Goose Creek around the Smelter were again subjected to injuries to their persons and real or personal property caused by exposure to the emitted particulates.

17.    Defendants believe they will have the problems causing the emissions control system to malfunction corrected by October 16 to October 18, yet Defendants continued and continue to operate the Smelter knowing the emissions control system may again malfunction and emit particulates into the atmosphere until such time as a permanent fix for the system failure is achieved.

## PLAINTIFFS

18.    Plaintiffs Leslie Deaver and Robert B. Deaver are citizens of South Carolina and reside at 708 East Saltash Alley in Goose Creek in Berkeley County, South Carolina.   Leslie and Robert Deaver leased and continuously resided at 708 East Saltash Alley from October 2007 to the present.   The Deavers' residence at 708 East Saltash Alley is located approximately 1.3 miles from stacks emitting particulate matter from the Smelter.   Leslie and Robert Deaver suffered injuries and damages caused by Defendants' wrongful particulate emissions.

19.    Plaintiff Nicholas A. Marino is a citizen of South Carolina and resides at 169 Ashton Drive in Goose Creek in Berkeley County, South Carolina.   Nicholas Marino owned and continuously resided at 169 Ashton Drive from August 2008 to the present.   Nicholas Marino's residence at 169 Ashton Drive is located approximately 1.6 miles from stacks emitting particulate matter from the Smelter.   Nicholas Marino suffered injures and damages caused by Defendants' wrongful particulate emissions.

20.    Plaintiff Jennifer Marino is a citizen of South Carolina and resides at 169 Ashton Drive in Goose Creek in Berkeley County, South Carolina.   Jennifer Marino continuously resided at 169 Ashton Drive from the summer of 2020 to the present.   Jennifer Marino's residence at 169 Ashton Drive is located approximately 1.6 miles from stacks emitting particulate matter from the

Smelter.    Jennifer Marino suffered injuries and damages caused by Defendants' wrongful particulate emissions.

21.    Plaintiff Amber Brown is a citizen of South Carolina and resides at 409 Amy Drive in Goose Creek in Berkeley County, South Carolina.   Brown leased and continuously resided at 409 Amy Drive from July 2023 to the present.   Brown's residence at 409 Amy Drive is located approximately 2.4 miles from stacks emitting particulate matter from the Smelter.   Brown suffered injuries and damages caused by Defendants' wrongful particulate emissions.

22.    Plaintiff Barry Bumford is a citizen of South Carolina and resides at 112 Brockman Way in Goose Creek in Berkeley County, South Carolina.   Bumford owned and continuously resided at 112 Brockman Way from February 2017 to the present.   Bumford's residence at 112 Brockman Way is located approximately 1.35 miles from stacks emitting particulate matter from the Smelter.   Bumford suffered injuries and damages caused by Defendants' wrongful particulate emissions.

23.    Plaintiff Catherine B. Burns is a citizen of South Carolina and resides at 91 Milton Drive in Goose Creek in Berkeley County, South Carolina.   Burns owned and continuously resided at 91 Milton Drive from August 2018 to the present.   Burns' residence at 91 Milton Drive is located approximately 6.6 miles from stacks emitting particulate matter from the Smelter. Burns suffered injuries and damages caused by Defendants' wrongful particulate emissions.

24.    Plaintiffs Katie L. Higgs and Troy L. Higgs are citizens of South Carolina and reside at 167 Cypress Preserve Boulevard in Moncks Corner in Berkeley County, South Carolina. Katie and Troy Higgs owned and continuously resided at 167 Cypress Preserve Boulevard from July 2022 to the present.   The Higgs' residence at 167 Cypress Preserve Boulevard is

approximately 3.4 miles from stacks emitting particulate matter from the Smelter.    Katie and Troy Higgs suffered injuries and damages caused by Defendants' wrongful particulate emissions.

25.    Plaintiff Robert Keene is a citizen of South Carolina and resides at 262 Hastings Drive in Goose Creek in Berkeley County, South Carolina.    Robert Keene owned and continuously resided at 262 Hastings Drive from April 2018 to the present.    Robert Keene's residence at 262 Hastings Drive is located approximately 1.65 miles from stacks emitting particulate matter from the Smelter.    Robert Keene suffered injuries and damages caused by Defendants' wrongful particulate emissions.

26.    Plaintiff Jennifer Poston is a citizen of South Carolina and resides at 262 Hastings Drive in Goose Creek in Berkeley County, South Carolina.    Jennifer Poston owned and continuously resided at 262 Hastings Drive from 2009 to the present.    Jennifer Poston's residence at 262 Hastings Drive is located approximately 1.65 miles from stacks emitting particulate matter from the Smelter.    Jennifer Poston suffered injuries and damages caused by Defendants' wrongful particulate emissions.

27.    Plaintiff Melissa Morris is a citizen of South Carolina and resides at 100 Wilton Street in Goose Creek in Berkeley County, South Carolina.    Morris continuously resided at 100 Wilton Street from August 2001 to the present.    Moriss's residence at 100 Wilton Street is located approximately 1.5 miles from stacks emitting particulate matter from the Smelter.    Morris suffered injuries and damages caused by Defendants' wrongful particulate emissions.

28.    Plaintiff Travis Shippell is a citizen of South Carolina and resides at 440 Ashburton Drive in Goose Creek in Berkeley County, South Carolina.    Shippell continuously resided at 440 Ashburton Drive from 2017 to the present.    Shippell's residence at 440 Ashburton Drive is located

approximately 1.2 miles from stacks emitting particulate matter from the Smelter.   Shippell suffered injuries and damages caused by Defendants' wrongful particulate emissions.

29.     Plaintiff Myrna S. Siebel is a citizen of South Carolina and resides at 102 Tokeena Court in Goose Creek in Berkeley County, South Carolina.   Siebel owned and continuously resided at 102 Tokeena Court from December 2016 to the present.   Siebel's residence at 102 Tokeena Court is located approximately 1.5 miles from stacks emitting particulate matter from the Smelter.   Siebel suffered injuries and damages caused by Defendants' wrongful particulate emissions.

30.     Plaintiff Daniel Howell is a citizen of South Carolina and resides at 169 Two Hitch Road in Goose Creek in Berkeley County, South Carolina.   Howell owned and continuously resided at 169 Two Hitch Road from December 2021 to the present.   Howell's residence at 169 Two Hitch Road is located approximately 2.1 miles from stacks emitting particulate matter from the Smelter.   Howell suffered injuries and damages caused by Defendants' wrongful particulate emissions.

## DEFENDANTS

31.     Defendant Century Aluminum Company is a corporation incorporated in and operating under the laws of Delaware and with its principal place of business located at One South Wacker Drive, Suite 1000, Chicago, Illinois.

32.     Defendant Century Aluminum of South Carolina, Inc. is a wholly-owned subsidiary of Defendant Century Aluminum Company.

33.     Defendant Century Aluminum of South Carolina, Inc. is a corporation incorporated in and operating under the laws of Delaware and with its principal place of business located at One

South Wacker Drive, Suite 1000, Chicago, Illinois.

34.     For many years prior to 2014, Defendant Century Aluminum Company owned an interest in the Smelter through its wholly-owned subsidiary Berkeley Aluminum, Inc. and operated the Smelter as a joint venture with Alumax of South Carolina, Inc.

35.     On October 23, 2014, Berkeley Aluminum, Inc. entered into a stock purchase agreement with Alumax, Inc. to acquire all the issued and outstanding shares of capital stock of Alumax of South Carolina, Inc.   As a term of the stock purchase agreement, Berkeley Aluminum, Inc. for itself and Defendant Century Aluminum Company released and discharged any liabilities and losses that they had against the seller.   As a term of the stock purchase agreement, Berkeley Aluminum, Inc. was to be provided information subject to the terms of a Confidentiality Agreement entered into between Alco and Defendant Century Aluminum Company dated July 11, 2014.

36.     On December 1, 2014, Defendant Century Aluminum Company, through its wholly-owned subsidiary Berkeley Aluminum, Inc., acquired the remaining ownership stake in the Smelter and became the sole owner of the Smelter.

37.     On December 3, 2014, Defendant Century Aluminum Company merged Berkeley Aluminum, Inc. into Alumax of South Carolina, Inc. and changed the surviving entity's name to "Century Aluminum of South Carolina, Inc.," Defendant Century Aluminum of South Carolina, Inc.

38.     On December 18, 2014, Defendant Century Aluminum Company entered into a Supplemental Indenture making Defendant Century Aluminum of South Carolina, Inc. a guarantor of Century Aluminum Company's June 4, 2013 Indenture for 7.500% Senior Secured Notes Due

2021.

39.    From December 2014 to the present, Defendant Century Aluminum Company has owned and operated the Smelter through its wholly-owned subsidiary Defendant Century Aluminum of South Carolina, Inc.

40.    In its Form 10-K annual report for the fiscal year ended December 31, 2022, filed with the United States Securities and Exchange Commission on February 27, 2023, Defendant Century Aluminum Company states that it and its subsidiaries together "operate three U.S. aluminum smelter, in Hawesville, Kentucky ('Hawesville'), currently curtailed, Robards, Kentucky ('Sebree') and Goose Creek, South Carolina ('Mt. Holly'), and one aluminum smelter in Grundartangi, Iceland ('Grundartangi')."

41.    In its Form 10-K annual report for the fiscal year ended December 31, 2022, filed with the United States Securities and Exchange Commission on February 27, 2023, Defendant Century Aluminum Company states that it and Defendant Century Aluminum of South Carolina, Inc. together "began a multi-year project to restore previously curtailed capacity at Mt. Holly. The initial phase was completed in the second quarter of 2022 and returned production capacity to approximately 172,000 MT per annum (75% of capacity)."

42.    On May 24, 2013, Defendant Century Aluminum Company; Berkeley Aluminum, Inc.; and other subsidiaries of Defendant Century Aluminum Company entered into a Loan and Security Agreement with lenders Wells Fargo Capital Finance, LLC and Credit Suisse AG whereby, as stated in Defendant Century Aluminum Company's Form 8-K filed with the Securities and Exchange Commission on May 24, 2013, the "Borrower's obligations under the New Credit Facility are guaranteed by certain of the Company's domestic subsidiaries and secured by a first

priority security interest in all of the Borrowers' accounts receivable, inventory and certain bank accounts." Under the Loan and Security Agreement, Defendant Century Aluminum of South Carolina, Inc., through its predecessor entity Berkeley Aluminum, Inc., is obligated to pay and its assets are collateral for the indebtedness of Defendant Century Aluminum Company and its other subsidiaries.

43. On December 31, 2015, Defendant Century Aluminum Company, Defendant Century Aluminum of South Carolina, Inc., and other subsidiaries of Defendant Century Aluminum Company executed the Sixth Amendment to Amended and Restated Loan and Security Agreement with lender agent Wells Fargo Capital Finance, LLC thereby evidencing Defendant Century Aluminum of South Carolina, Inc.'s obligations on the debts of its parent company Defendant Century Aluminum of South Carolina, Inc. even for loaned funds that were not provided to or used for Defendant Century Aluminum of South Carolina, Inc.'s business.

44. As of the date of the filing of this action, Defendant Century Aluminum Company's website, www.centuryaluminum.com/home, states: "We are a global metals and mining company, focused on bauxite, alumina and aluminum. We operate globally, with operations in the U.S., Iceland, Jamaica, and Netherlands."

45. As of the date of the filing of this action, Defendant Century Aluminum Company's website, www.centuryaluminum.com/home, states: "Century's wholly owned Mt. Holly aluminum smelter, located in Berkeley County, South Carolina, has a production capacity of approximately 229,000 metric tonnes of aluminum per year."

46. As of the date of the filing of this action, Defendant Century Aluminum Company's website, www.centuryaluminum.com/home, states: "Century's wholly owned Mt. Holly

aluminum smelter, located in Berkeley County, South Carolina, has a production capacity of approximately 229,000 metric tonnes of aluminum per year."

47.    Defendant Century Aluminum Company exercises total control over all aspects of Defendant Century Aluminum of South Carolina, Inc.'s operation of the Smelter.

48.    At all relevant times, Defendant Century of Aluminum of South Carolina, Inc. acted within the scope of its agency with Defendant Century Aluminum Company as principal and intended Defendant Century of Aluminum of South Carolina, Inc.'s actions serve the interests of Defendant Century Aluminum Company, with Defendant Century of Aluminum of South Carolina, Inc.'s actions directed, authorized, or known and approved by Defendant Century of Aluminum Company.

49.    At an October 9, 2023 public meeting regarding the particulate emissions, the manager of the Smelter, Dennis Harbath, introduced himself as the manager of "Century Aluminum's" plant, referred to himself and the other employees at the Smelter as employees of "Century Aluminum," stated that "Century Aluminum" had been operating the Smelter for forty years, and made no distinction between Defendant Century Aluminum Company and Defendant Century Aluminum of South Carolina, Inc.

50.    According to Dennis Harbath's LinkedIn page, he describes himself as having been employed with "Century Aluminum" from May 2013 to the present, with his employment from May 2013 to December 2017 have been at a smelter owned by a subsidiary of Defendant Century Aluminum Company in Hawesville, Kentucky.  Dennis Harbath considers his employer to be Defendant Century Aluminum Company regardless of whether he is working at a facility owned by a particular subsidiary of Defendant Century Aluminum Company.

51.     As of the date of the filing of this action, the physical signage at the entrance to the Smelter on Highway 52 in Berkeley County, South Carolina states "Mt. Holly Century Aluminum" and does not identify Defendant Century Aluminum of South Carolina, Inc.

## JURISDICTION AND VENUE

52.     This action seeks recovery for injuries to the Plaintiffs' and the Class's health, real property, and personal property resulting from Defendants' wrongful and tortious actions and omissions which occurred at and around the Smelter in Berkeley County, South Carolina, and caused damages to Plaintiffs and the Class in Berkeley County, South Carolina.

53.     At all relevant times, Defendants have conducted business in and have availed themselves of the privilege of conducting business in the State of South Carolina.

54.     This action arises out of business transacted in and tortious actions and omissions committed in South Carolina and which caused injuries to Plaintiffs and the Class in South Carolina.

55.     The Court has personal jurisdiction over Defendants because the claims asserted in this action arise out of and relate to Defendants' respective and collective purposeful contacts with South Carolina.

56.     This Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).   CAFA jurisdiction exists because there are more than one-hundred Class Members and the aggregate amount in controversy exceeds five million dollars.

57.     Independent of and in addition to original jurisdiction under CAFA, this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand

dollars.

58.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to Plaintiffs' claims took place in this judicial District and because the property that is the subject of this action is situated in this District.

59.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to Plaintiffs' claims took place in this judicial District and because the property that is the subject of this action is situated in this District.

## FACTUAL BACKGROUND

### The Smelter

60.    The Smelter is a primary aluminum production facility.

61.    Primary aluminum production refers to the production of aluminum directly from mined ore as compared to production of aluminum from scrap.   U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-1 (5th ed. 1995, rev. 1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0).

62.    In the primary production of aluminum, bauxite ore mined from the earth is refined using the Bayer process to separate out the alumina from the other minerals present in the ore. U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-1 (1998),    https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0; Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 5 (1998), https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0.

63.    The alumina is then converted to aluminum metal through electrolytic reduction in the Hall-Héroult process.  U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-1 (1998) https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0; Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 6 (1998) https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0.

64.    The molten aluminum produced by the Hall-Héroult process is then subjected to additional processing such as alloying, impurity removal, casting, and sawing.  U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-1–12.1-3 (1998) https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0; Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 8 (1998) https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0.

65.    The Smelter takes alumina and converts it into aluminum metal through electrolytic reduction and then transports the molten aluminum to a cast house where it undergoes additional processing.  Ex. A, Permit TV-04200-0015.

66.    In aluminum smelters generally and the Smelter specifically, the electrolytic reduction of alumina occurs in shallow rectangular steel shells lined with carbon, commonly referred to as "pots."  U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-1 (1998) https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0; Pacific Environmental

Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 6 (1998) https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0; Ex. A, Permit TV-04200-0015.

67.     The Smelter uses prebaked anode cells for the electrolytic reduction.    U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-3 (1998) https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0; Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 7 (1998) https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0; Ex. A, Permit TV-04200-0015.

68.     The Smelter has two "Potlines," each of which is a row of 180 pots.    Ex. A, Permit TV-04200-0015.

69.     In the Smelter's Green Carbon Plant, coke and pitch are milled to produce a paste which is formed into green anodes.    Ex. A, Permit TV-04200-0015.

70.     The green anodes are then transported to the Smelter's Baked Carbon Plant where they are baked in ring furnaces.    Ex. A, Permit TV-04200-0015.

71.     The baked anodes are then transported to the Smelter's Anode Rodding area where metal rods are attached to the baked anodes.    Ex. A, Permit TV-04200-0015.

72.     Upon attachment of the metal rods to the baked anodes, a pot is ready for use in the Smelter's Potline for the electrolytic reduction of alumina.    Ex. A, Permit TV-04200-0015.

73.     On the Smelter's Potline, each pot contains the carbon anodes and carbon cathodes with alumina, an electrolytic bath, and additives, and voltage is applied across the pot.    Ex. A,

Permit TV-04200-0015.

74.    During the electrolytic reduction, aluminum is deposited at the cathode, where it remains as molten metal below the surface of the electrolytic bath, and periodically, the molten aluminum is tapped, siphoned out of the pot, and transported to the cast house.   Ex. A, Permit TV-04200-0015.

75.    Upon completion of use on the Potline, anodes are returned to the Anode Rodding area where the electrolytic bath is removed and returned to the Potline for reuse, the rods are removed, and the carbon anode is crushed and transported to the Green Carbon Plant for recycling into new green anodes.   Ex. A, Permit TV-04200-0015.

76.    The electrolytic reduction cells, the "pots" produce particulate emissions including alumina, carbon, aluminum fluoride, calcium fluoride, cryolite, and ferric oxide particulates.   U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-4 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 8 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Ex. A, Permit TV-04200-0015.

77.    The anode baking ovens also emit particulates.   U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-4 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 9 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-

volume-i-chapter-12-metallurgical-0); Ex. A, Permit TV-04200-0015.

78.    Smelters generally use a variety of emissions control devices to remove from the exhausted air particulate emissions created by the reduction cells and anode baking furnaces.    U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-4 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 8 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Ex. A, Permit TV-04200-0015.

79.    Without emissions control devices removing particulates, a prebaked anode smelter, like the Smelter, emits substantial quantities of $PM_{10}$ and $PM_{2.5}$.    U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-8 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 32 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0).

80.    Without emissions control devices removing particulates, fifty-eight percent by mass of the particulates emitted by an aluminum smelter using prebaked anode cells would be smaller than 10 µm in equivalent aerodynamic particle diameter, *i.e.*, $PM_{10}$.    U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-8 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Pacific Environmental Services, Inc., Background Report AP-42

Section 12.1 Primary Aluminum 32 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0).

81.     Without emissions control devices removing particulates, twenty-eight percent by mass of the particulates emitted by an aluminum smelter using prebaked anode cells would be smaller than 2.5 μm in equivalent aerodynamic particle diameter, *i.e.*, $PM_{2.5}$.   U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-8 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 32 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0).

82.     Without emissions control devices removing particulates, aluminum smelters using prebaked anode cells emit substantial quantities of particulates significantly smaller than $PM_{2.5}$, with eighteen percent by mass of uncontrolled emissions consisting of particulates smaller than 1.25 μm in equivalent aerodynamic particle diameter and thirteen percent by mass of uncontrolled emissions consisting of particulates smaller than 0.625 μm in equivalent aerodynamic particle diameter.   U.S. Environmental Protection Agency, AP-42: Compilation of Air Emissions Factors 12.1-8 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0); Pacific Environmental Services, Inc., Background Report AP-42 Section 12.1 Primary Aluminum 32 (1998) (https://www.epa.gov/air-emissions-factors-and-quantification/ap-42-fifth-edition-volume-i-chapter-12-metallurgical-0).

83.     When the emissions control devices are functioning, the Smelter uses a system of dust collectors, scrubbers, and baghouse to capture particulates and prevent their emissions into

the ambient air.   Ex. A, Permit TV-04200-0015.

## Statutes and Regulations

84.    The Clean Air Act requires the Administrator of the Environmental Protection Agency to propose regulations setting national primary and secondary ambient air quality standards for specified pollutants.   42 U.S.C. § 7409.

85.    The Clean Air Act provides the national primary ambient air quality standards "shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health."   42 U.S.C. § 7409.

86.    The Clean Air Act provides the national secondary ambient air quality standards "shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." 42 U.S.C. § 7409.

87.    The Clean Air Act provides that every five years, the Administrator is to review the national ambient air quality standards using an independent scientific review committee and revise the standards as may be appropriate following that review.   42 U.S.C. § 7409.

88.    Setting the National Ambient Air Quality Standards for $PM_{10}$, the United States Code of Federal Regulations provides that the "level of the national primary and secondary 24-hour ambient air quality standards for particulate matter is 150 micrograms per cubic meter ($\mu/m^3$), 24-hour average concentration."   40 C.F.R. § 50.6(a).

89.    Setting the National Ambient Air Quality Standards for $PM_{2.5}$, the United States

Code of Federal Regulations provides that for $PM_{2.5}$ the "national primary ambient air quality standards for $PM_{2.5}$ are 12.0 micrograms per cubic meter ($\mu g/m^3$) annual arithmetic mean concentration and 35 $\mu g/m^3$ 24-hour average concentration measured in the ambient air as $PM_{2.5}$ (particles with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers)." 40 C.F.R. § 50.18(a).

90.    In 2012, the United States Environmental Protection Agency amended the federal regulations to establish a new annual $PM_{2.5}$ primary standard of 12 $\mu g/m^3$ and retained the 24-hour $PM_{2.5}$ standard of 35 $\mu g/m^3$.

91.    The South Carolina Pollution Control Act declares the State's public policy "to maintain reasonable standards of purity of the air and water resources of the State, consistent with the public health, safety, and welfare of its citizens, . . . ." S.C. Code Ann. § 48-1-20

92.    The South Carolina Pollution Control Act directs the South Carolina Department of Health and Environmental Control to "adopt standards and determine what qualities and properties of water and air shall indicate a polluted condition and these standards shall be promulgated and made a part of the rules and regulations of the Department." S.C. Code Ann. § 48-1-40.

93.    The South Carolina Pollution Control Act provides a civil penalty for violation of the Act and provides that a willful or grossly negligent violation of the Act is a misdemeanor punishable by a fine or imprisonment, but the Act explicitly provides that "[n]o private cause of action is created by or exists pursuant to this chapter." S.C. Code Ann. §§ 48-1-250, -320, & -330.

94.    Regulation 61-62.1 § 1 defines "Particulate Matter" as "any material, except

uncombined water, that exists in a finely divided form as a liquid or solid at standard conditions."

95.    Regulation 61-62.1 § 1 defines "Particulate Matter Emissions" as "all finely divided solid or liquid material, other than uncombined water, emitted to the ambient air."

96.    Regulation 61-62.3(I) provides that the Commissioner of the South Carolina Department of Health and Environmental Control may declare an air pollution "emergency" when $PM_{10}$ concentrations reach "500 µg/m$^3$, twenty-four (24)-hour average," an air pollution "alert" when $PM_{10}$ concentrations reach "420 µg/m$^3$, twenty-four (24)-hour average," and an air pollution "watch" when $PM_{10}$ concentrations reach "350 micrograms per cubic meter (µg/m$^3$), twenty-four (24)-hour average."

97.    Regulation 61-62.3(II) provides that in an air pollution alert, "[i]ndustrial sources including . . . metals . . . which require considerable lead time for shut-down" are to "take all required control actions for this Alert Level to include" the "[m]aximum reduction of air contaminants from manufacturing operations by, if necessary, assuming reasonable economic hardships by postponing production and allied operations."

98.    Regulations 61-62.3(II) provides that in an air pollution emergency, "primary metals . . . industries shall take the following control actions: Elimination of air pollutants from manufacturing operations by ceasing, curtailing, postponing or deferring production and operations to the extent possible without causing injury to persons or damage to equipment."

99.    Regulation 61-62.5, Standard No. 2 Ambient Air Quality Standards adopts the Code of Federal Regulations particulate primary and secondary ambient air quality standards, setting the following PM standards for South Carolina:

| Pollutant | Reference | Measuring Interval | $\mu g/m^3$ (micrograms per cubic meter) |
|-----------|-----------|--------------------|------------------------------------------|
| $PM_{10}$ | 40 C.F.R. 50.6 | 24 hour | 150 |
| $PM_{2.5}$ | 40 C.F.R. 50.13 | 24 hour | 35 |
| $PM_{2.5}$ | 40 C.F.R. 50.18 | Annual (primary) | 12 |
| $PM_{2.5}$ | 40 C.F.R. 50.18 | 24 hour | 35 |
| $PM_{2.5}$ | 40 C.F.R. 50.18 | Annual (secondary) | 15 |

100.     Regulation 61-62.1 § 2(F) provides that a facility discharging air pollution must obtain and comply with an operating permit, a Title V permit, from the South Carolina Department of Health and Environmental Control.

**Title V Operating Permit**

101.     Pursuant to the Pollution Control Act, Section 48-1-50(5), 48-1-100(A), and 48-1-110(a) of the South Carolina Code of Laws and the Air Pollution Control Regulations and Standards, Regulation 61-62 of the South Carolina Code of Regulations, Chapter 85 of Title 42 of the United States Code, and Title 40 of the Code of Federal Regulations, the South Carolina Department of Health and Environmental Control issued a Title V Operating Permit, Permit Number TV-0420-0015, to Defendants on June 23, 2021, with the permit effective on July 1, 2021 ("Permit TV-0420-0015").   Ex. A, Permit TV-04200-0015.

102.     Pursuant to South Carolina and federal statutes and regulations, Defendants were legally required to operate the Smelter in accordance with the terms, limitations, standards, and schedules in Permit TV-0420-0015.

103.     On January 23, 2023, and January 27, 2023, Defendants submitted two applications

to revise Permit TV-0420-0015. Ex. B, Nov. 2, 2023 Order of Administrator of United States Environmental Protection Agency, Petition No. IV-2023-09 at 7.

104. The South Carolina Department of Health and Environmental Control issued Defendants an amended Permit TV-0420-0015 on April 13, 2023. Ex. B, Nov. 2, 2023 Order of Administrator of United States Environmental Protection Agency, Petition No. IV-2023-09 at 7.

105. On November 2, 2023, the Administrator of the United States Environmental Protection Agency issued an Order Granting in Part and Denying in Part a Petition for Objection to a Title V Operating Permit in Petition No. IV-2023-09 and objected to the issuance of the amended Permit TV-0420-0015. Ex. B, Nov. 2, 2023 Order of Administrator of United States Environmental Protection Agency, Petition No. IV-2023-09.

106. From January of 2023 through October of 2023, Defendants' operation of the Smelter was subject to Permit TV-0420-0015.

107. Permit TV-0420-0015 requires that emissions of filterable particulate matter, particulate matter of less than 10 microns in size, also known as $PM_{10}$, and particulate matter of less than 2.5 microns in size, also known as $PM_{2.5}$, from the green carbon plant, baked carbon plant, anode rodding, potlines, and cast house at the Smelter "be limited to 0.005 grain/dscf, each pollutant, each source using baghouse controls." Ex. A, Permit TV-0420-0015 at C.7. In the "grain/dscf" specification, a "grain" is a unit of measurement of mass equal to 64.79891 milligrams, and "dscf" is a standard cubic foot of dry gas, meaning Permit TV-04200-0015 requires the particulate emissions be equal to or less than .324 milligrams of particulates per standard cubic foot of dry gas.

108. Permit TV-0420-0015 requires that emissions of filterable particulate matter, $PM_{10}$,

and PM$_{2.5}$ from the anode rodding, potlines, and pot repair at the Smelter "be limited to 0.0035 grain/dscf, each source, using baghouse controls."   Ex. A, Permit TV-0420-0015 at C.22

109.    Permit TV-04200-0015 requires that emissions of filterable particulates from the green carbon plant at the Smelter "be limited to 0.75 lb/hr."   Ex. A, Permit TV-0420-0015 at C.8.

110.    Permit TV-04200-0015 requires that emissions of filterable particulates from each pot room group "be limited to 28.73 lb/hr."   Ex. A, Permit TV-0420-0015 at C.23.

111.    Permit TV-04200-0015 requires that particulate emissions from the green carbon plant, baked carbon plant, anode rodding, potlines, and cast house at the Smelter "be limited to the rate specified by the use of the following equations: For process weight rates less than or equal to 30 tons per hour E=(F) 4.10P$^{0.67}$ and For process weight rates greater than 30 tons per hour E=(F) 55.0P$^{0.11}$-40 Where E = the allowable emission rate in pounds per hour P=process weight rate in tons per hour F = effect factor from Table B in S.C. Regulation 61-62.5, Standard No. 4."   Ex. A Permit TV-0420-0015 at C.9.

112.    Permit TV-04200-0015 requires that "[e]ach baghouse shall be in place and operational whenever processes controlled by it are running, except during periods of baghouse malfunction or mechanical failure."   Ex. A, Permit TV-0420-0015 at C.7, C.8, C.22, & C.23.

113.    Permit TV-04200-0015 requires that the baghouse pressure drop be measured and recorded daily.   Ex. A, Permit TV-0420-0015 at C.36.

114.    Permit TV-04200-0015 requires that the baghouse collection system be inspected and maintained each month.   Ex. A, Permit TV-0420-0015 at C.36.

115.    Permit TV-04200-0015 requires that the baghouse pressure drop be a value between 1.0 inch to 9.9 inches of water and defines an "excursion" as "any operating condition where the

indicator is outside the approved range" of 1.0 to 9.9 inches of water.   Permit TV-04200-0015 requires that upon the detection of an excursion, Defendants "restore operation of the pollutant-specific emissions unit (including the control device and associated capture system) to its normal or usual manner of operation as expeditiously as practicable in accordance with good air pollution control practices for minimizing emissions" including "taking any necessary corrective actions to restore normal operation and prevent the likely recurrence of the cause of an excursion."   Ex. A, Permit TV-0420-0015 at C.36.

116.    Defendants' particulate emissions on September 3, 16, and 30 and their responses to those emissions violated Permit TV-04200-0015.

117.    The South Carolina Department of Health and Environmental Control's Statement of Basis for the 2021 Title V renewal permit stated the Smelter had the potential to emit 485 tons per year of particulate matter and 334 tons per year of $PM_{10}$/ $PM_{2.5}$.   Such potential particulate emissions equate to 1.3 tons per day of particulate matter and .9 tons per day of $PM_{10}$/ $PM_{2.5}$ particulate matter, or alternatively, 108 pounds of particulate matter per hour and 75 pounds of $PM_{10}$/ $PM_{2.5}$ per hour.   The majority of the particulate matter the Smelter would emit were the required emissions controls not in place and operating properly would be $PM_{10}$/ $PM_{2.5}$ emissions (69% of particulates emitted).

118.    On December 7, 2022, the South Carolina Department of Health and Environmental Control posted a public notice for PSD Construction Permit No. 0420-0015-CY for modification of the Smelter and stated therein: "Emissions generated by this facility as a result of the proposed project will include: Particulate Matter (PM); Particulate Matter less than 10 micrometers in diameter ($PM_{10}$); Particulate Matter less than 2.5 micrometers in diameter ($PM_{2.5}$)."   Ex. D,

SCDHEC, Bureau of Air Quality, Notice of a Draft Air Prevention of Significant Deterioration (PSD) Construction Permit, Public Notice #22-091-PSD.

### Adverse Health Effects of the Particulate Emissions

119.    Particle pollution—also called particulate matter (PM)—is made up of particles of solid that are suspended in the air.

120.    Assessing the National Air Quality Standards through an independent scientific review committee as required by Section 109(d) of the Clean Air Act, in 2019 the United States Environmental Protection Agency published the Integrated Science Assessment for Particulate Matter (the "ISA").    United States Environmental Protection Agency, Integrated Science Assessment          for          Particulate          Matter          (2019), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=539935.

121.    The ISA "is a comprehensive evaluation and synthesis of policy-relevant science aimed at characterizing exposures to ambient particulate matter (PM), and health and welfare effects associated with these exposures."    United States Environmental Protection Agency, Integrated     Science     Assessment     for     Particulate     Matter     at     ES-1     (2019), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=539935.

122.    The ISA concludes that for short term exposure (defined as exposure from hours to one month) to $PM_{2.5}$ there is a causal relationship with cardiovascular effects and mortality, a likely causal relationship with respiratory effects, and suggestive of a causal relationship, but not sufficient to infer, with metabolic effects, nervous system effects, and reproductive and developmental effects.    United States Environmental Protection Agency, Integrated Science Assessment          for          Particulate          Matter          at          ES-9–11          (2019),

https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=539935.

123.    The ISA concludes that for short term exposure to $PM_{10}$ the results are suggestive of a causal relationship, but not sufficient to infer, with respiratory effects, cardiovascular effects, and mortality.   United States Environmental Protection Agency, Integrated Science Assessment for         Particulate         Matter         at         ES-9–11         (2019), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=539935.         The    ISA's conclusion of a suggestion of causal relationship for $PM_{10}$, but not sufficient to infer, is the result of a need for additional research and data on the relationship between exposure to $PM_{10}$ and human health.   United States Environmental Protection Agency, Integrated Science Assessment for Particulate         Matter         at         ES-23         (2019), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=539935.

124.    "Recent epidemiologic studies continue to provide strong evidence for a relationship between short-term $PM_{2.5}$ exposure and several respiratory-related endpoints, including asthma exacerbation, chronic obstructive pulmonary disease (COPD) exacerbation, and combined respiratory-related diseases, particularly from studies examining emergency department (ED) visits and hospital admissions."   United States Environmental Protection Agency, Integrated Science         Assessment         for         Particulate         Matter         at         ES-12         (2019), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=539935.

125.    "[T]here is a causal relationship between short-term $PM_{2.5}$ exposure and cardiovascular effects."   United States Environmental Protection Agency, Integrated Science Assessment         for         Particulate         Matter         at         ES-13         (2019), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=539935.

126.    "A large body of scientific evidence spanning many decades clearly demonstrates there are health effects attributed to both short- and long-term PM exposure."  United States Environmental Protection Agency, Integrated Science Assessment for Particulate Matter at ES-22 (2019), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=539935.

127.    According to the United States Environmental Protection Agency, $PM_{10}$ are "inhalable particles, with diameters that are generally 10 micrometers and smaller" and $PM_{2.5}$ are "fine inhalable particles, with diameters that are generally 2.5 micrometers and smaller."  United States Environmental Protection Agency, Particulate Matter (PM) Basics (July 11, 2023), https://www.epa.gov/pm-pollution/particulate-matter-pm-basics#PM.

128.    According to the United States Environmental Protection Agency, "Some particles less than 10 micrometers in diameter can get deep into your lungs and some may even get into your bloodstream.  Of these, particles less than 2.5 micrometers in diameter, also known as fine particles or $PM_{2.5}$, pose the greatest risk to health."  United States Environmental Protection Agency, Particulate Matter (PM) Basics (July 11, 2023), https://www.epa.gov/pm-pollution/particulate-matter-pm-basics#PM.

129.    According to the United States Environmental Protection Agency, exposure to inhalable particulates "can affect both your lungs and your heart" and "[n]umerous scientific studies have linked particle pollution exposure to a variety of problems, including: premature death in people with heart or lung disease, nonfatal heart attacks, irregular heartbeat, aggravated asthma, decreased lung function, [and] increased respiratory symptoms, such as irritation of the airways, coughing or difficulty breathing."  United States Environmental Protection Agency, Health and Environmental Effects of Particulate Matter (PM) (August 23, 2023), https://www.epa.gov/pm-

pollution/health-and-environmental-effects-particulate-matter-pm.

130.    According to the National Center for Environmental Health in the Centers for Disease Control and Prevention in the United States Department of Health & Human Services, larger particulates, generally $PM_{10}$, irritate mucous membranes in the eyes, nose, and throat. Centers for Disease Control and Prevention, Particle Pollution (Feb. 16, 2023), https://www.cdc.gov/air/particulate_matter.html.

131.    According to the National Center for Environmental Health in the Centers for Disease Control and Prevention in the United States Department of Health & Human Services, smaller particulates, generally $PM_{2.5}$, can be inhaled into a person's lungs and cause more significant and permanent adverse effects on health.   Centers for Disease Control and Prevention, Particle Pollution (Feb. 16, 2023), https://www.cdc.gov/air/particulate_matter.html.

132.    According to the National Center for Environmental Health in the Centers for Disease Control and Prevention in the United States Department of Health & Human Services, particulates exacerbate and worsen respiratory issues like asthma and can cause trouble breathing. Centers for Disease Control and Prevention, Particle Pollution (Feb. 16, 2023), https://www.cdc.gov/air/particulate_matter.html.

133.    According to the National Center for Environmental Health in the Centers for Disease Control and Prevention in the United States Department of Health & Human Services, particulates exacerbate heart problems and cause chest pain or tightness, fast heartbeat, shortness of breath, tiredness, and heart attacks.  Centers for Disease Control and Prevention, Particle Pollution (Feb. 16, 2023), https://www.cdc.gov/air/particulate_matter.html.

134.    According to the Agency for Toxic Substances and Disease Registry in the United

States Department of Health & Human Services, "studies suggest that asthma symptoms can be worsened by increases in the levels of $PM_{10}$." Agency for Toxic Substances and Disease Registry, Environmental Triggers of Asthma (Dec. 29, 2014), https://www.atsdr.cdc.gov/csem/asthma/environmental_triggers_of_asthma.html#pm2.

135. According to the Agency for Toxic Substances and Disease Registry's Toxicological Profile for Aluminum, the most commonly reported respiratory effect observed in persons exposed to aluminum oxide is pulmonary fibrosis. Agency for Toxic Substances and Disease Registry, Toxicological Profile for Aluminum (Sept. 2008), https://www.atsdr.cdc.gov/ToxProfiles/tp22.pdf.

136. According to the Agency for Toxic Substances and Disease Registry's Toxicological Profile for Aluminum, "[n]umerous studies have found impaired lung function in a variety of aluminum workers" and "[o]ther effects that have been observed include occupational asthma and pulmonary fibrosis." Agency for Toxic Substances and Disease Registry, Toxicological Profile for Aluminum (Sept. 2008), https://www.atsdr.cdc.gov/ToxProfiles/tp22.pdf.

137. According to the Agency for Toxic Substances and Disease Registry's Toxicological Profile for Aluminum, "[a]cute-, intermediate-, and chronic-duration animal studies [of alumina inhalation] have also reported respiratory effects. These respiratory effects include increases in alveolar macrophages, granulomatious lesions in the lungs and peribronchial lymph nodes, and increases in lung weight." Agency for Toxic Substances and Disease Registry, Toxicological Profile for Aluminum (Sept. 2008), https://www.atsdr.cdc.gov/ToxProfiles/tp22.pdf.

138.   "By the 1970s, a link between respiratory disease and particulate air pollution and/or sulfur oxide pollution had been well established."   C. Arden Pope III, David V. Bates, & Mark E. Raizenne, Health Effects of Particular Air Pollution, 103 Environmental Health Perspectives 472, 472 (1995).

139.   Studies of the impacts of particulates on human health have found particulates cause decreased lung function, respiratory symptoms, asthma, and cough.   C. Arden Pope III, David V. Bates, & Mark E. Raizenne, Health Effects of Particular Air Pollution, 103 Environmental Health Perspectives 472, 473 (1995).

140.   Most studies of acute morbidity effects of particulates have found "[s]tatistically significant associations between hospital/health care visits for respiratory illnesses and particulate pollution."   C. Arden Pope III, David V. Bates, & Mark E. Raizenne, Health Effects of Particular Air Pollution, 103 Environmental Health Perspectives 472, 474–75 (1995).

141.   Studies of the impacts of particulates on human health have found increased daily mortality associated with increased particulates, and "[r]espiratory disease deaths were most strongly associated with particulate pollution levels, but statistical associations were also observed for cardiovascular disease deaths."   C. Arden Pope III, David V. Bates, & Mark E. Raizenne, Health Effects of Particular Air Pollution, 103 Environmental Health Perspectives 472, 475–76 (1995).

142.   Reviews of scientific studies of the impacts of particulates on human health "have noted considerable consistency across studies."   C. Arden Pope III, David V. Bates, & Mark E. Raizenne, Health Effects of Particular Air Pollution, 103 Environmental Health Perspectives 472, 477 (1995).

143.    "Observed health effects of respirable particulate pollution include: increase incidence of respiratory symptoms, decreased lung function, increased hospitalizations and other health care visits for cardiopulmonary disease, increased respiratory morbidity as measured by absenteeism from work or school or other restrictions in activity, and increased cardiopulmonary disease mortality."  C. Arden Pope III, David V. Bates, & Mark E. Raizenne, Health Effects of Particular Air Pollution, 103 Environmental Health Perspectives 472, 478 (1995).

144.    For particulates, "[t]here is no clear evidence of a safe threshold level.  Many studies observe that health effects increase monitonically with pollution levels, often with a near-linear dose-response relationship."  C. Arden Pope III, David V. Bates, & Mark E. Raizenne, Health Effects of Particular Air Pollution, 103 Environmental Health Perspectives 472, 478–79 (1995).

### Plaintiffs' Exposure to the Particulates and Damages Therefrom

145.    Plaintiff Leslie Deaver first noticed particulates settling on her property in August of 2023.  At times in September of 2023, the particulates settled on, interfered with her use and enjoyment of, and damaged her home, yard, barbecue grill, and vehicle.  She sustained personal injuries caused by physical contact with and inhalation of the particulates including headaches, difficulty breathing, and throat and eye irritation.

146.    Plaintiff Robert Deaver first noticed particulates settling on his property in August of 2023.  At times in September of 2023, particulates emitted by the Smelter settled on, interfered with his use and enjoyment of, and damaged his home, yard, barbecue grill, and vehicle.  He sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including asthma, headaches, difficulty breathing, and throat and eye irritation.

He was rushed to the emergency room by ambulance on September 3, 2023, for an asthma episode that caused him to collapse in his driveway while working on his vehicle, and he has been undergoing medical treatment with a pulmonary specialist since September 3, 2023.

147. Plaintiff Nicholas Marino first noticed particulates on his property on September 2, 2023. At times in September of 2023, particulates emitted by the Smelter settled on, interfered with his use and enjoyment of, and damaged his home, yard, barbecue grill, and vehicle. Specifically, the particulates emitted by the Smelter scratched the paint on his vehicle and clogged the sunroof drain and caused water to leak into his vehicle. He sustained personal injuries caused by physical contract with and inhalation of particulates emitted by the Smelter, including headaches and throat and eye irritation.

148. Plaintiff Jennifer Marino first noticed particulates on her property on September 2, 2023. At times in September of 2023, particulates emitted by the Smelter settled on, interfered with her use and enjoyment of, and damaged her home, yard, barbecue grill, and vehicle. She sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty breathing, and skin, throat, and eye irritation. She developed and was diagnosed with bronchiectasis as the result of her physical contact with and inhalation of the particulates emitted by the Smelter.

149. Plaintiff Brown first noticed particulates settling on her property in August of 2023. At times in September of 2023, particulates emitted by the Smelter settled on, interfered with her use and enjoyment of, and damaged her home, yard, and vehicle. Her dog died from exposure to the particulates emitted by the Smelter. She sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty

breathing, and throat and eye irritation.

150.    Plaintiff Bumford first noticed particulates settling on his property in March of 2023.  At times in September of 2023, particulates emitted by the Smelter settled on, interfered with his use and enjoyment of, and damaged his home, yard, and vehicle.  Specifically, the particulates emitted by the Smelter scratched the paint on his vehicle.  He sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty breathing, and throat and eye irritation.

151.    Plaintiff Burns first noticed particulates on her property on September 2, 2023.   At times in September of 2023, particulates emitted by the Smelter settled on, interfered with her use and enjoyment of, and damaged her home, yard, barbecue grill, and vehicle.  She sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty breathing, and throat and eye irritation.  Due to her coughing caused by her physical contact with and inhalation of particulates emitted by the Smelter, she has been forced to sleep in a different room from her husband.   Her physical contact with and inhalation of particulates emitted by the Smelter exacerbated her asthma.  She is undergoing medical treatment with a pulmonary specialist.

152.    Plaintiff Katie Higgs first noticed particulates on her property on September 2, 2023.  At times in September of 2023, particulates emitted by the Smelter settled on, interfered with her use and enjoyment of, and damaged her home, yard, barbecue grill, and vehicle.  Her dogs experienced health problems from exposure to the particulates emitted by the Smelter.   She sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches and eye irritation.

153.    Plaintiff Troy Higgs first noticed particulates on his property on September 2, 2023. At times in September of 2023, particulates emitted by the Smelter settled on, interfered with his use and enjoyment of, and damaged his home, yard, barbecue grill, and vehicle.  His dogs experienced health problems from exposure to the particulates emitted by the Smelter.  He sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches and eye irritation.

154.    Plaintiff Keene first noticed particulates on his property in March of 2023.  At times in September of 2023, particulates emitted by the Smelter settled on, interfered with his use and enjoyment of, and damaged his home, yard, barbecue grill, and vehicle.  He sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty breathing, and throat and eye irritation.  He developed and was diagnosed with a respiratory infection as the result of his physical contact with and inhalation of the particulates emitted by the Smelter.

155.    Plaintiff Poston first noticed particulates on her property in March of 2023.  At times in September of 2023, particulates emitted by the Smelter settled on, interfered with her use and enjoyment of, and damaged his home, yard, barbecue grill, and vehicle.  She sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty breathing, and throat and eye irritation.  She developed and was diagnosed with a respiratory infection, was prescribed an inhaler, and is using an inhaler, all as the result of her physical contact with and inhalation of the particulates emitted by the Smelter.

156.    Plaintiff Morris first noticed particulates on her property on September 2, 2023.

At times in September of 2023, particulates emitted by the Smelter settled on, interfered with her use and enjoyment of, and damaged her home, yard, barbecue grill, and vehicle. Her dog experienced health problems from exposure to the particulates emitted by the Smelter. She sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty breathing, and throat and eye irritation.

157.    Plaintiff Shippell first noticed particulates on his property in March of 2023. At times in September of 2023, particulates emitted by the Smelter settled on, interfered with his use and enjoyment of, and damaged his home, yard, barbecue grill, and vehicle. His two dogs experienced health problems and died from exposure to the particulates emitted by the Smelter. He sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty breathing, and throat and eye irritation.

158.    Plaintiff Siebel first noticed particulates on her property in August of 2023. At times in September of 2023, particulates emitted by the Smelter settled on, interfered with her use and enjoyment of, and damaged her home, yard, and vehicle. She sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including headaches, difficulty breathing, and throat and eye irritation. She developed severe respiratory injuries and complications from her physical contact with and inhalation of particulates emitted by the Smelter, and she is undergoing medical treatment with a pulmonary specialist.

159.    Plaintiff Howell first noticed particulates on his property in early 2023. At times in September of 2023, particulates emitted by the Smelter settled on, interfered with his use and enjoyment of, and damaged his home, yard, and vehicle. Specifically, the particulates emitted from the Smelter in September of 2023 damaged the paint on his vehicle and discolored the

decking on his porch. He sustained personal injuries caused by physical contact with and inhalation of particulates emitted by the Smelter, including sinus and chest congestion, excess mucus, cough, runny nose, and eye irritation.

## CLASS ACTION ALLEGATIONS

160.    Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

161.    Plaintiff Deaver brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:   All persons who, continuously from September 3, 2023, through September 30, 2023, resided on property located at or within seven miles of a stack emitting particulate matter from the Smelter (the "Class Area").   Excluded from the Class are: (1) any person with an ownership interest of more than 1% of Century Aluminum Corporation; (2) any current or former officer or director of Defendants; (3) any current or former employee of Defendants for particulate alumina exposure and injury that occurred at the Smelter during their employment with Defendants; (4) persons who entered into a settlement agreement with Defendants independent of this action for claims related to the claims asserted in this action; (5) the legal representatives, successors, or assigns of Defendants; and (6) any judge or federal, state, or local government administrative agency official or employee who has or may decide some or all issues in the case, any permit issued to Defendants, or any administrative action related to air emissions from the Smelter, any person related to such a judge, official, or employee in a manner that would create a conflict of interest, any law clerk or chambers staff working for such a judge, and any courthouse staff who perform work related to this action.

162.    A Class defined by a radius of seven miles from the Smelter bears a strong

relationship to the locations at which residents experienced negative health impacts from the alumina particulates and at which residents observed alumina particulates accumulate on their properties.

163.    Plaintiffs reserve the right to revise the Class definition and Class Area based on facts obtained through the continued litigation of this action, including expert investigation and discovery from, among other sources, Defendants and the South Carolina Department of Health and Environmental Control, as well as air and weather monitoring and modeling data.    In particular, the Class definition may be amended, expanded or contract in certain areas based upon expert evaluation of prevailing wind patterns, emissions factors, and other relevant considerations.

164.    This action is proper for resolution as a class action under Rule 23 of the Federal Rules of Civil Procedure.

165.    While the exact number and identities of the other Class members are unknown to Plaintiffs at this time, Plaintiffs are informed and believe that there are many thousands of Class members.    The Class Area includes all or the vast majority of the City of Goose Creek, excepting the Naval Weapons Station, Joint Base Charleston.    The City of Goose Creek had a population of 45,946 persons as of the 2020 Census.    United States Census Bureau, Decennial Census, Goose Creek                   city                   South                   Carolina, https://data.census.gov/table/DECENNIALPL2020.P2?g=160XX00US4529815.    The United States Environmental Protection Agency calculated "a total population of approximately 39,389 residents within a five-kilometer [(3.1 miles)] radius of the facility."    Ex. B, Nov. 2, 2023 Order of Administrator of United States Environmental Protection Agency, Petition No. IV-2023-09 at 7.    Thus, the Class includes more than 39,000 persons, and the Class members are so numerous

that individual joinder of all Class members is impracticable.

166.    Common questions of law and fact arise from Defendants' conduct alleged herein.

167.    The common questions of law and fact arising from Defendants' conduct alleged herein are common to all Class members and predominate over any questions affecting individual Class members.

168.    The common questions of law and fact arising from Defendants' conduct alleged herein include:

    a.    Defendants' production of alumina particulates and other particulates at the Smelter;

    b.    The failure of the baghouse and emissions controls at the Smelter in September of 2023;

    c.    Defendants' emissions of alumina particulate matter and other particulate matter from the Smelter in September of 2023;

    d.    Defendants' violations of applicable federal and state laws, regulations, and permits by emitting alumina particulates and other particulates from the Smelter in September of 2023;

    e.    Whether Defendants trespassed on Plaintiffs' and the Class members' properties;

    f.    Whether Defendants' particulate emissions were a nuisance;

    g.    Whether Defendants were negligent in emitting the particulates as alleged herein;

    h.    Whether, and to what extent, Class members suffered damages from the

particulates emitted from the Smelter by Defendants in September of 2023;

169.    Plaintiffs' claims are typical of those of the Class members because Plaintiffs and the other Class member sustained damages arising out of the same wrongful conduct, as detailed herein.  Plaintiffs and Class members sustained similar injuries arising out of Defendants' wrongful conduct.  Plaintiffs' and the Class members' injuries were caused directly by Defendants' wrongful conduct.

170.    In addition, the factual background of Defendants' wrongful conduct is common to all Class members and represents a common wrongful conduct resulting in injury to all Class members.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of Class members and are based on the same legal theories.

171.    Plaintiffs will fairly and adequately represent and pursue the interests of the Class. Plaintiffs understand the nature of their claims herein, have no disqualifying conditions, and will vigorously represent the interests of the Class members.   Neither Plaintiffs nor Plaintiffs' counsel have any interests that conflict with or are antagonistic to the interests of the Class members.

172.    Plaintiffs retained competent and experienced attorneys to represent their interests and those of the Class members.  Plaintiffs' counsel have the necessary financial, staff, and technology resources to litigate this class action adequately and vigorously.   Deaver and Plaintiffs' counsel are aware of their fiduciary responsibility to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class members.

173.    The prerequisites of maintaining a class action pursuant Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only

individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Judicial and party resources will be conserved and the dispute will be more efficiently resolved by concentrating the litigation of the claims in this forum and this action and providing for the single adjudication of common issues. The adjudication of this controversy through a class action will avoid the potential for inconsistent and conflicting adjudications of the claims asserted herein.

## FOR A FIRST CAUSE OF ACTION
**Trespass**

174.    Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

175.    Plaintiffs bring this claim on behalf of themselves and the other members of the Class for damages for trespass under South Carolina law.

176.    On multiple occasions in September of 2023, the baghouse and emissions control systems at the Smelter failed to function as intended and required.

177.    In September of 2023, the failures of the baghouse and emissions control systems permitted the emission of substantial quantities of alumina particulates and other particulates from the stacks at the Smelter and into the ambient air in the area around Goose Creek.

178.    Defendants intentionally continued operation of the Smelter and the emission of particulates after Defendants learned of the failure of the baghouse and emissions control systems.

179.    After learning of the failure of the baghouse and emissions control systems, Defendants emitted particulates with the knowledge that the particulates would enter the ambient air and then settle out of the air onto property owned by persons and entities other than Defendants.

180.    Defendants' emissions of alumina particulates and other particulates from the

Smelter in September of 2023, violated the applicable federal and state statutes, regulations, and permits.

181.    The particulates emitted from the Smelter in September of 2023 entered the air on Plaintiffs' and the Class members' properties and settled out of the air onto the real property, fixtures, vehicles, and other personal property of Plaintiffs' and the Class members.

182.    The alumina particulates and other particulates emitted from the Smelter were physical, tangible objects that invaded Plaintiffs' and the Class members' properties.

183.    The alumina particulates and other particulates emitted from the Smelter that settled out of the air onto Plaintiffs' and the Class members' property interfered with Plaintiffs' and the Class members' exclusive possession of their properties.

184.    Plaintiffs and the Class members are entitled to recover actual damages, nominal damages, compensatory damages, consequential damages, punitive damages, attorney's fees and costs, and any other relief the Court deems appropriate.

<u>**FOR A SECOND CAUSE OF ACTION**</u>
**Nuisance**

185.    Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

186.    Plaintiffs bring this claim on behalf of themselves and the other members of the Class for damages for private nuisance under South Carolina law.

187.    Defendants' emissions of alumina particulates and other particulates from the Smelter in September of 2023, was the unlawful and unreasonable operation of the Smelter in a manner producing injury, annoyance, and unreasonable interference with the lawful use and enjoyment of the property of others.

188.    The particulates emitted from the Smelter in September of 2023 entered the air on Plaintiffs' and the Class members' properties and settled out of the air onto the real property, fixtures, vehicles, and other personal property of Plaintiffs' and the Class members.

189.    The alumina particulates and other particulates emitted from the Smelter that were present in the air on and settled out of the air onto Plaintiffs' and the Class members' property substantially and unreasonably interfered with Plaintiffs' and the Class members' use and enjoyment of their properties.

190.    Plaintiffs and the Class members are entitled to recover compensatory damages, consequential damages, punitive damages, attorneys' fees and costs, and other relief the Court deems appropriate.

<u>**FOR A THIRD CAUSE OF ACTION**</u>
**Negligence, Gross Negligence, Recklessness, and Willful Conduct**

191.    Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

192.    Defendants are liable for common law negligence because they breached duties owed to Plaintiffs and the Class members.

193.    At all relevant times, Defendants owed a duty of care to Plaintiffs and the Class members to prevent the emission of particulates generated by the Smelter into the ambient air.

194.    At all relevant times, Defendants also owed duties to Plaintiffs and the Class members through the following statutes, regulations, standards, and permits:

    a.    Pursuant to Section 7409 of Title 42 of the United States Code; the National Ambient Air Quality Standards and Sections 50.6, 50.13, and 50.18 of Title 50 of the Code of Federal Regulations; Sections 48-1-20, -40, -250, -320, and -330 of the

South Carolina Code of Laws; Regulations 61-62.1, 61-62.3, and 61-62.5 of the South Carolina Code of Regulations; and Title V Operating Permit No. TV-0420-0015, Defendants owed a duty to not emit particulates harmful to human health or property;

b.  Pursuant to Section 7409 of Title 42 of the United States Code; the National Ambient Air Quality Standards and Sections 50.6, 50.13, and 50.18 of Title 50 of the Code of Federal Regulations; Sections 48-1-20, -40, -250, -320, and -330 of the South Carolina Code of Laws; Regulations 61-62.1, 61-62.3, and 61-62.5 of the South Carolina Code of Regulations; and Title V Operating Permit No. TV-0420-0015, Defendants owed a duty to not emit particulates, $PM_{10}$, or $PM_{2.5}$ in excess of the amounts permitted in the Title V Operating Permit for the Smelter; and

c.  Pursuant to Section 7409 of Title 42 of the United States Code; the National Ambient Air Quality Standards and Sections 50.6, 50.13, and 50.18 of Title 50 of the Code of Federal Regulations; Sections 48-1-20, -40, -250, -320, and -330 of the South Carolina Code of Laws; Regulations 61-62.1, 61-62.3, and 61-62.5 of the South Carolina Code of Regulations; and Title V Operating Permit No. TV-0420-0015, Defendants owed a duty to not emit $PM_{10}$ or $PM_{2.5}$ in such quantity as to cause the ambient air to exceed the National Ambient Air Quality Standards for $PM_{10}$ or $PM_{2.5}$.

195.    Defendants negligently breached the duty of care by failing to act with reasonable care in operating the Smelter.

196.    Defendants negligently breached the duty of care by failing to act with reasonable

care to prevent the particulate emissions from the Smelter.

197.    Defendants negligently breached the duty of care by emitting substantial quantities of particulates into the ambient air from the Smelter.

198.    Defendants negligently breached the duty of care by continuing operation of the Smelter after learning of the failures of the baghouse and emissions control systems.

199.    Defendants are liable for common law negligence because their breaches of duties owed to Plaintiffs and the Class members directly and proximately caused personal injuries to Plaintiffs and the Class members and damaged Plaintiffs' and the Class members' properties.

200.    Defendants knew or should have known that their failure to use reasonable care in controlling, monitoring, maintaining, and operating the Smelter, including capturing particulates generated by the Smelter rather than emitting those particulates into the ambient air, would cause harm to Plaintiffs and the Class members.

201.    Defendants' violations of the duty of care were grossly negligent, willful and wanton, reckless, and calculated to cause harm to persons and property, including Plaintiffs and the Class Members and their properties.

202.    Plaintiffs and the Class members are entitled to recover general, compensatory, special, and punitive damages and such other relief as the Court deems appropriate.

### FOR A FOURTH CAUSE OF ACTION
#### Negligence *Per Se*

203.    Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

204.    Defendants negligently violated the Federal Clean Air Act, the South Carolina Pollution Control Act, and the federal and state regulations and permits implementing those

statutes.

205.    At all relevant times, Defendants owed duties to Plaintiffs and the Class members through the following statutes, regulations, standards, and permits:

a.  Pursuant to Section 7409 of Title 42 of the United States Code; the National Ambient Air Quality Standards and Sections 50.6, 50.13, and 50.18 of Title 50 of the Code of Federal Regulations; Sections 48-1-20, -40, -250, -320, and -330 of the South Carolina Code of Laws; Regulations 61-62.1, 61-62.3, and 61-62.5 of the South Carolina Code of Regulations; and Title V Operating Permit No. TV-0420-0015, Defendants owed a duty to not emit particulates harmful to human health or property;

b.  Pursuant to Section 7409 of Title 42 of the United States Code; the National Ambient Air Quality Standards and Sections 50.6, 50.13, and 50.18 of Title 50 of the Code of Federal Regulations; Sections 48-1-20, -40, -250, -320, and -330 of the South Carolina Code of Laws; Regulations 61-62.1, 61-62.3, and 61-62.5 of the South Carolina Code of Regulations; and Title V Operating Permit No. TV-0420-0015, Defendants owed a duty to not emit particulates, $PM_{10}$, or $PM_{2.5}$ in excess of the amounts permitted in the Title V Operating Permit for the Smelter; and

c.  Pursuant to Section 7409 of Title 42 of the United States Code; the National Ambient Air Quality Standards and Sections 50.6, 50.13, and 50.18 of Title 50 of the Code of Federal Regulations; Sections 48-1-20, -40, -250, -320, and -330 of the South Carolina Code of Laws; Regulations 61-62.1, 61-62.3, and 61-62.5 of the South Carolina Code of Regulations; and Title V Operating Permit No. TV-0420-

0015, Defendants owed a duty to not emit $PM_{10}$ or $PM_{2.5}$ in such quantity as to cause the ambient air to exceed the National Ambient Air Quality Standards for $PM_{10}$ or $PM_{2.5}$.

206.    Plaintiffs and the Class members are members of the classes of persons the foregoing statutes and regulations were enacted to protect.

207.    The essential purposes of the foregoing statutes, regulations, and permits are to protect persons from the same or similar kind of harm inflicted upon Plaintiffs and the Class members as a direct and proximate result of Defendants' breaches of those statutory and regulatory duties.

208.    Plaintiffs and the Class members are members of the public that utilize the air covered by and protected from pollution by the Clean Air Act, South Carolina Pollution Control Act, and the implementing regulations and permits.

209.    Defendants breached the duty of care by continuing to operate the Smelter after learning of the failure of the baghouse and emissions control systems and resulting emissions of particulates.

210.    Defendants breached the duty of care by emitting quantities of particulates in excess of those permitted under the applicable statutes, regulations, and permits.

211.    Defendants breached the duty of care by emitting particulates harmful to human health and property.

212.    Defendants' breaches of their duties directly and proximately caused personal injuries to Plaintiffs and the Class members and damaged Plaintiffs' and the Class members' properties.

213.    Plaintiffs and the Class members are entitled to recover general, compensatory, special, and punitive damages and such other relief as the Court deems appropriate.

WHEREFORE, Plaintiffs demand a jury trial and pray for judgment against Defendants for actual, nominal, consequential, compensatory, general, special, and punitive damages, attorney's fees, costs, and for such other and further relief as this Court deems just and proper.

THE STEINBERG LAW FIRM, LLC
61 Broad Street
Charleston, SC 29401
(843) 720-2800 - office
(843) 722-1900 – facsimile
www.steinberglawfirm.com


By:        s/Elliotte Quinn
F. Elliotte Quinn IV
Fed. ID No.: 12563
SC Bar No.: 100450
equinn@steinberglawfirm.com

Michael J. Jordan
Fed. ID No.: 10304
SC Bar No.: 74902
mjordan@steinberglawfirm.com

William S. Jackson IV
Fed. ID No.: 13047
SC Bar No.: 103199
wjackson@steinberglawfirm.com

*Attorneys for Plaintiffs*